[S.F. No. 25069. Sept. 24, 1987.]

CHARLES ANTHONY PACHECO, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

Frank D. Winston for Petitioner.

Herbert M. Rosenthal, Truitt A. Richey, Jr., and Richard J. Zanassi for Respondent.

**OPINION**

**THE COURT.**—Charles Anthony Pacheco seeks review of the refusal of the Committee of Bar Examiners of the State Bar (Committee) to certify him to this court for admission to the bar on the ground that he lacks the good moral character required for such admission. (Bus. & Prof. Code, § 6066; Cal. Rules of Court, rule 952, subd. (c); Rules Regulating Admission to Practice Law, rule I, § 11.) For the reasons set forth below, we hereby order such certification.

Pacheco, who is 43, graduated from Lincoln Law School in Sacramento in 1978. He passed the bar examination in 1980, but the Committee refused to certify him pending an investigation into his moral character. After completing its investigation, the Committee concluded in 1982 that Pacheco "did not possess the good moral character required by the Business and Professions Code sections 6060 and 6062 and rule X of the Rules Regulating Admission to Practice Law in California." Pacheco unsuccessfully petitioned this court for review of the Committee's 1982 decision not to certify him.

In 1984 Pacheco reapplied for admission to practice law, as permitted under rule X, section 104, subdivision (a) of the Rules Regulating Admission to Practice Law in California.[1] Pursuant to rule X, section 104, subdivisions (a) and (b), the Committee convened a hearing panel in 1985 to investigate Pacheco's moral character. In 1985, the panel recommended that Pacheco not be certified; the panel's recommendation was restated but

---

[1] Unless otherwise noted, all references to rules are to the Rules Regulating Admission to Practice Law in California.

essentially unchanged in January 1986. Pacheco sought a hearing before the full Committee as permitted under rule X, section 103, subdivision (b). The Committee heard the matter in June 1986. Two months later, the Committee issued its findings and conclusion that Pacheco did not possess good moral character and, on that basis, the Committee refused to certify him. The grounds for the Committee's refusals to certify Pacheco in 1982 and 1986 are set forth in part III below.

## I. *The "Good Moral Character" Requirement.*

This court may admit to the practice of law any applicant whose qualifications have been certified to it by the California Committee of Bar Examiners. (Bus. & Prof. Code, § 6064.[2]) To qualify for certification, an applicant must, among other things, be of "good moral character." (Bus. & Prof. Code, § 6060, subd. (b)[3]; *In re Stepsay* (1940) 15 Cal.2d 71, 73 [98 P.2d 489].) The burden of proving good moral character is upon the applicant. (Rule X, § 101, subd. (a);[4] *Hightower* v. *State Bar* (1983) 34 Cal.3d 150, 155 [193 Cal.Rptr. 153, 666 P.2d 10]; *Hall* v. *Committee of Bar Examiners* (1979) 25 Cal.3d 730, 734 [159 Cal.Rptr. 848, 602 P.2d 768].)

The term "good moral character" has traditionally been defined in California as " 'an absence of proven conduct or acts which have been historically considered as manifestations of "moral turpitude." ' " (*Hallinan* v. *Committee of Bar Examiners* (1966) 65 Cal.2d 447, 452 [55 Cal.Rptr. 228, 421 P.2d 76].) Good moral character has also been defined to include "qualities of honesty, fairness, candor, trustworthiness, observance of fiduciary responsibility, [observance] of the laws of the state and the nation and respect for the rights of others and for the judicial process." (Rule X, § 101, subd. (a).) The requirement that applicants to practice law be of good moral character is a prerequisite to practice law in every state of our country. (See *Konigsberg* v. *State Bar* (1960) 366 U.S. 36, 40, fn. 4 [6 L.Ed.2d 105, 111, 81 S.Ct. 997].)

▇ Once the applicant has furnished enough evidence of good character to establish a prima facie case, the Committee may attempt to rebut that

---

[2] Section 6064 of the Business and Professions Code prescribes: "Upon certification by the examining committee that the applicant has fulfilled the requirements for admission to practice law, the Supreme Court may admit such applicant as an attorney at law in all the courts of this State and may direct an order to be entered upon its records to that effect. A certificate of admission thereupon shall be given to the applicant by the clerk of the court."

[3] Section 6060, subdivision (b) of the Business and Professions Code states that to be certified to this court for admission to the practice of law, the person must "[b]e of good moral character."

[4] Rule X, section 101, subdivision (a), states in pertinent part: "Every applicant shall be of good moral character. The applicant shall have the burden of proving that he or she is possessed of good moral character."

showing with evidence of bad character. (*Hightower* v. *State Bar, supra,* 34 Cal.3d 150, 155; *Hall* v. *Committee of Bar Examiners, supra,* 25 Cal.3d 730, 734.) Any applicant who is denied certification may seek to have the Committee's action reviewed by this court. (Bus. & Prof. Code, § 6066; Cal. Rules of Court, rule 952, subd. (c); rule I, § 11.) ■ The Committee's findings are entitled to great weight, but are not binding on this court. Instead, we independently examine and weigh the evidence and pass upon its sufficiency. (*Hightower* v. *State Bar, supra,* 34 Cal.3d 150, 155-156.)

## II. *Pacheco's Prima Facie Case.*

At the hearing in 1985, Pacheco introduced into evidence several letters attesting to his good moral character. Of these letters, five were submitted by judges, fourteen by practicing attorneys, and one by a medical doctor. By stipulation with the principal referee, five persons who submitted letters on Pacheco's behalf were permitted to testify as "a reasonable sampling" of the support for Pacheco's application. This testimony substantially paralleled the information supplied in the letters. Accordingly, and in the interest of brevity, we summarize that information as follows: Pacheco is intelligent, conscientious, and honest. He is a good investigator. He has devoted numerous pro bono investigative hours to minority clients. Generally speaking he is held in high regard by the attorneys and judges who know him and who are familiar with his work. If in the past he had any deficiencies in his moral character, he has overcome them.

In addition to furnishing numerous character references, Pacheco testified that he has practiced as a licensed private investigator for 10 years in California without a single charge of misconduct. Pacheco also noted that he has never been charged with, let alone convicted of, any crime.

■ It seems clear that Pacheco presented a prima facie case that he is presently of good moral character. (*Hallinan* v. *Committee of Bar Examiners, supra,* 65 Cal.2d 447, 454.) Our inquiry, therefore, shifts to the sufficiency of the Committee's rebuttal evidence. (See *Siegel* v. *Committee of Bar Examiners* (1973) 10 Cal.3d 156, 164 [110 Cal.Rptr. 15, 514 P.2d 967].)

## III. *The Committee's Rebuttal Evidence.*

In its notice of hearing, the Committee identified the specific matters which would be the subject of the Committee's inquiry regarding Pacheco's moral fitness: "*The purpose of the hearing is to allow you to present evidence of your rehabilitation since the denial of certification in July 1982, to examine your conduct since that date, and to inquire into any litigation in which you have been involved, including family law matters such as dissolution and*

*child support.*" In a letter to Pacheco sent a few weeks prior to the 1985 hearing, the principal referee confirmed that "Direct evidence will not be taken from second parties as to matters found by the Committee of Bar Examiners in their July 12, 1982 decision, unless in examination of applicant, the State Bar Examiner specifically opens up questions in addition to whether applicant is now telling the truth."

The hearing panel conducted a three-day hearing. Near the conclusion of the hearing, the parties disputed the effect of the Committee's 1982 findings of unfitness. Pacheco's attorney argued that the hearing panel should only consider Pacheco's conduct subsequent to the 1982 hearing, as the hearing notice clearly indicated that rehabilitation was the primary issue before the panel. The State Bar argued that rehabilitation cannot properly be considered without first examining that from which one is supposedly rehabilitated. The hearing panel ultimately decided, correctly we believe, that rehabilitation requires a consideration of those offenses from which one has allegedly been rehabilitated.

Thus, in its findings issued in January 1986, the panel stated that it had considered the Committee's 1982 findings, as well as three new matters. The panel recommended that Pacheco not be certified. Since the 1982 findings played a role in the panel's 1985 recommendation, the 1982 findings, in addition to the three new matters are briefly summarized below.

A. *1982 Findings.*

The Committee's 1982 findings are based on incidents that took place between 1969 and 1977.[5] The most serious of these findings indicated that in 1974, Pacheco counseled a murder witness on how to avoid a subpoena, and that his testimony in 1982 regarding this incident, as well as other incidents, "was not candid or truthful." The Committee also found that Pacheco was involved in several minor incidents, most of which arose out of his duties as a California Highway Patrol officer and later as a private investigator. These incidents included improper collection and storage of evidence, inaccurate record-keeping, and suspect loan practices. In the Committee's view, these incidents demonstrated a lack of respect for the judicial process and for the rights of others. The Committee also found that Pacheco's testimony on these matters "was not candid or truthful." The other incidents which formed the basis for the Committee's 1982 findings were on the whole, factually suspect, or of such questionable validity as yardsticks of Pacheco's moral character that we need not specifically address them with respect to the issue of petitioner's rehabilitation.

---

[5] Pacheco challenged virtually every one of the Committee's 1982 findings in his unsuccessful petition for review to this court in 1983.

B. *1986 Findings.*

1) *Child custody matter*: While working as a licensed private investigator in 1984, Pacheco was hired by an attorney, Michael Brady. Brady informed Pacheco that he had a Canadian client whose wife had removed their child, an infant, contrary to a valid Canadian court order. Brady hired Pacheco to help locate the child and assist in taking custody on behalf of the child's father. Brady set up a meeting with Buckey, the mother's attorney (who was also her sister), at which the child was present. When Buckey and the child emerged from the meeting, Pacheco and three other individuals, including the child's father, surrounded her and the child. After a struggle, Buckey surrendered custody of the child to the father.

Pacheco testified that only the father touched Buckey. Buckey, on the other hand, testified that Pacheco restrained her arm from behind, causing her to surrender the child. Buckey's husband, also present during the incident, testified that Pacheco restrained his wife's arm. The panel found that "the method used in what apparently was a legal retaking . . . was inconsistent with the ethical and professional qualities of a person seeking to practice law in California and showed lack of rehabilitation."

2) *Property transfers*: Pacheco and his wife, Carolyn, were divorced in 1976. As part of the dissolution, Pacheco transferred the family residence to Carolyn. Thereafter, he filed for and received a reduction in his child support payments to his previous wife from $250 to $120 per month. Pacheco and Carolyn were physically separated for no more than one week, after which they resumed cohabitation. Pacheco testified that he would remarry Carolyn, although both parties confirmed that Carolyn has refused to remarry.

The panel found that the transfer of the family residence from Pacheco to Carolyn "did not cause a sham reduction of [Pacheco's] ability to pay child support."[6] Similarly, the panel found that a transfer of Pacheco's interest in Hawaiian real property to Carolyn well before he sought to reduce his child support obligation was "motivated by love . . . and was legally accomplished." The panel found that "the totality of the evidence relating to transfers of property to Carolyn and the subsequent dissolution of their marriage was neutral and showed neither lack of good moral character nor showed any particular rehabilitation on [Pacheco's] part . . . ."

3) *Parker's Directory*: Pacheco was listed as an attorney in Parker's Directory and in several quarterly directories of Sacramento-Yolo attorneys

---

[6] The panel also found that Carolyn's testimony at the August 1985 hearing indicated that Pacheco "was a father who (despite one child support reduction) cared for his children and provided almost beyond his means for their education."

published by The Daily Recorder after July 1982. The panel found that although Pacheco "took no active part in making such listings and that they were made without his knowledge or consent," Pacheco "should have been more thorough, vigorous and deliberate in attempting to be 'de-listed' and that the continued listing *could have been* improperly [*sic*] to his advantage. The panel further finds that such failure to aggressively pursue 'de-listing' is a minor consideration and standing alone does not show a lack of good moral character." (Italics by the panel.)

In addition to making the foregoing findings, the panel found that Pacheco "presented a favorable appearance to the panel and appeared to be forthright in his answers and responded fully to all questions. . . . The totality of [Pacheco's] appearance was that of a mature individual who has suffered at least his share of the hard knocks of the world who is determined to become an attorney practicing in California . . . . Other witnesses appearing in support of [Pacheco's] rehabilitation, in general, indicated that he was inspirational in helping young persons in their early work experiences and in finding career goals."

### C. *1986 Conclusions.*

Notwithstanding the foregoing findings, the hearing panel concluded that Pacheco's pre-1977 misconduct was "part of a fabric of lack of candor and truthfulness which require a long period of rehabilitation." The panel also concluded: "Applicant's failure in almost all instances to advise persons writing letters or appearing on his behalf in support of his rehabilitation or good moral character of the facts and circumstances surrounding his earlier denial of admission was of itself lack of candor which embarrassed witnesses, deprived the panel of what could have been helpful testimony and showed lack of rehabilitation." The panel recommended unanimously that Pacheco's application be denied.

### D. *The Committee's Findings and Conclusion.*

Pursuant to rule X, section 103, subdivision (b), the matter was heard anew before the full Committee. The Committee heard testimony from Pacheco and arguments by counsel. It also read and considered the transcript and findings of the hearing panel. The Committee adopted the hearing panel's recommendation that Pacheco not be certified, but it made its own findings of fact regarding the incidents listed in the 1982 findings, essentially restating those findings, in addition to mentioning the new matters.

IV. *Our Review of the Evidence.*

██ The State Bar asserts that the fundamental question to be answered is "whether petitioner is a fit and proper person to practice law at this time." The point is well taken. ██ Whether the matter at issue relates to an applicant for admission or an attorney upon whom discipline has been imposed, the essential question remains the same: Is the petitioner a fit and proper person to be permitted to practice law? (See *March* v. *Committee of Bar Examiners* (1967) 67 Cal.2d 718, 720 [63 Cal.Rptr. 399, 433 P.2d 191]; *Hallinan* v. *Committee of Bar Examiners, supra,* 65 Cal.2d 447, 450-453.)

██ Most of the alleged misconduct upon which the Committee based its most recent refusal to certify Pacheco is at least 10 years old. Its value in determining Pacheco's alleged "present bad moral character" is diminished significantly by its age, and by the absence of similar, more recent misconduct. (See *Martin B.* v. *Committee of Bar Examiners* (1983) 33 Cal.3d 717, 726 [190 Cal.Rptr. 610, 661 P.2d 160].) The State Bar virtually concedes as much: "Clearly petitioner's conduct prior to 1982 foreclosed his admission [at that time] . . . . The issue now is whether his actions since 1982 demonstrate, in light of that former conduct, sufficient evidence of rehabilitation." We agree.[7] With the scope of our inquiry so framed, we turn first to the post-1982 incidents upon which the Committee purportedly relied to show Pacheco's lack of rehabilitation.

A. *Child Custody Matter.*

██ The State Bar asserts that Pacheco's involvement in the child custody matter demonstrates his lack of rehabilitation. The State Bar emphasizes that but for Pacheco's presence at the incident and grabbing the arm of the mother's attorney, the attorney would not have released custody of the child to the child's father.[8] Pacheco counters with the argument that the incident facilitated the reunification of a father and his child pursuant to a valid court order. He seems to imply that if anyone should be disciplined for the matter, it should be the mother's attorney who had custody of the baby in knowing violation of the court order.

Our own review of the record discloses little that is praiseworthy in Pacheco's conduct during this incident. His law enforcement background,

---

[7] Although the State Bar correctly emphasizes the importance of Pacheco's post-1982 rehabilitation, we are disturbed by the fact that such emphasis appears to be mere lip service given that the Committee's 1986 findings were based almost entirely on Pacheco's pre-1977 conduct.

[8] In its brief to this court, the State Bar repeatedly refers to Pacheco's involvement in the child custody incident as an "assault," although the Committee made no such finding, and no charges of assault were ever filed against Pacheco.

legal training, and employment as a private investigator should have alerted him to the risks inherent in "self-help" remedies. It is plain that such remedies are rarely favored in the law. Nevertheless, we cannot ascribe to this incident the telling significance found by the Committee. Our conclusion is rooted in several facts.

First, the child recovery plan was developed not by Pacheco, but by his employer, an attorney. Prior to the incident, the attorney contacted the Sacramento County District Attorney's office to confirm the legality of the proposed taking, and to put the office on notice. The attorney then instructed Pacheco as to how Pacheco could assist him. Although the attorney ultimately received an angry letter from the mother's attorney, with a copy sent to the State Bar, the bar initiated no disciplinary proceedings against the attorney who developed the child recovery plan. Second, the father had a valid and enforceable court order. Third, the mother's attorney admitted at Pacheco's 1985 hearing that her client was in violation of the Canadian court order, and that no California court order existed allowing her or the child's mother to interfere with the father's custody rights. Even the State Bar acknowledges, "If this were the only charge against petitioner, we might accept the explanation that everyone can make a mistake or be innocently misled." The child custody matter *is*, however, the only colorable incident involving Pacheco since his 1982 hearing. As explained below, the other grounds for the Committee's refusal to certify him are either too insignificant or too old to merit a finding that they rebut Pacheco's evidence of rehabilitation.

B. *Property Transfers.*

The hearing panel found that property transfers from Pacheco to Carolyn, and their subsequent dissolution were "neutral and showed neither lack of good moral character nor showed any particular rehabilitation" on Pacheco's part. The Committee adopted a similarly neutral stance on the issue: the Committee recited the allegation that the transfers were part of a scheme by Pacheco to avoid rightful child support payments, summarized Pacheco's arguments, but failed to make any finding of misconduct by Pacheco, and failed to cite the matter as support for its conclusion that Pacheco not be certified.

C. *Parker Directory Matter.*

The hearing panel found that Pacheco's "failure to aggressively pursue 'de-listing' is a minor consideration and standing alone does not show lack of good moral character." The Committee apparently viewed the matter as *so trivial as not to even merit discussion* in its findings and conclusion.

## V. *The Weight of Pacheco's Evidence.*

As noted earlier, Pacheco presented 20 letters on his behalf, 19 of which were written by lawyers or judges. ■ Traditionally, we have accorded great weight to testimonials submitted by attorneys and judges regarding an applicant's moral fitness. (*Tardiff* v. *State Bar* (1980) 27 Cal.3d 395, 403 [165 Cal.Rptr. 829, 612 P.2d 919]; *March* v. *Committee of Bar Examiners, supra,* 67 Cal.2d 718, 732; *Hallinan* v. *Committee of Bar Examiners, supra,* 65 Cal.2d 457, 454, fn. 6; *Preston* v. *State Bar* (1946) 28 Cal.2d 643, 651 [171 P.2d 435]; *In re Stepsay, supra,* 15 Cal.2d 71, 76; *Warbasse* v. *The State Bar* (1933) 219 Cal. 566, 571 [28 P.2d 19].) The value of such letters is, in large part, premised on the notion that such persons possess a keen sense of responsibility for the integrity of the legal profession. (*Warbasse* v. *The State Bar, supra,* 219 Cal. 566, 571.) Of particular value are letters written by persons who have known the applicant for years, and who address their remarks specifically to petitioner's moral fitness in light of his past misconduct. (*March* v. *Committee of Bar Examiners, supra,* 67 Cal.2d 718, 732.) Where it appears that the authors have furnished an honest estimate of the applicant's character, we are empowered to accept that estimate (*Warbasse* v. *The State Bar, supra,* 219 Cal. 566, 571), although the recommendation does not constitute conclusive evidence. (*Feinstein* v. *State Bar* (1952) 39 Cal.2d 541, 547 [248 P.2d 3].)

■ The State Bar contends, however, that the letters are not reliable because their authors "were not fully aware of the Committee's 1982 findings regarding petitioner's conduct and lack of candor and truthfulness in testifying before the State Bar Court." As explained below, the State Bar is correct that Pacheco failed to adequately apprise his witnesses of the Committee's specific 1982 findings. Pacheco's failure, however, goes to, and possibly diminishes the weight of an otherwise impressive array of testimonials. It does not invalidate those testimonials or render them meaningless.

The letter written by Pacheco's attorney inviting character references and sent to all who submitted letters on Pacheco's behalf stated: that the hearing was in connection with Pacheco's *re-application* for admission; that good moral character was an issue; and that the questions surrounding moral character were based on the Committee's concern over "some allegations from [Pacheco's] ex-wives; inquiry into an incident regarding [Pacheco's] employment with the [California Highway Patrol] in which the [Review] Committee did not find there to be evidence of any lack of good moral character; and on [a 1976 grand jury investigation of Pacheco's former employer] . . . . [¶] [S]moke from those various allegations and inquiries seemed to disturb some of the State Bar reviewing officials, who somehow

concluded [Pacheco] was lacking in candor and as a result recommended that he be denied admission to the State Bar."

Pacheco argues that the foregoing provisions of the letter alerted the addressees to the critical fact that Pacheco's moral character had been found wanting once before. From that argument we are presumably to infer that the addressees could have contacted Pacheco or his attorney for more details if they so desired. In our view, Pacheco's argument misses the mark. The relevant point is that some of the recommendations submitted on Pacheco's behalf were furnished by persons unaware of Pacheco's prior misconduct. Clearly, the letter inviting recommendations fails to inform the references of the Committee's specific 1982 findings.

Significantly, however, when asked on vigorous, pointed cross-examination whether the Committee's 1982 findings changed their recommendations of Pacheco, the witnesses without exception adhered to their recommendations, often bolstering their praise with additional facts in support of Pacheco's moral character. The witnesses' support of Pacheco after having been apprised of the 1982 findings serves to enhance the validity of their recommendations.

The witnesses who testified on Pacheco's behalf or who submitted letters of recommendation all had known Pacheco for a number of years. They were familiar with his work and had occasion to observe his moral character. Pacheco's letter to them at least made it clear, if they did not already know, that Pacheco had been denied admission once before based on his moral character. As members of the bar, they undoubtedly recognized the significance of a moral character investigation. If they were truly caught "off-guard" at the hearing by revelations concerning Pacheco's past conduct, nothing prevented them from retracting their endorsements. (See *In re Garland* (1934) 219 Cal. 661, 662 [28 P.2d 354].) Yet none of the witnesses chose to exercise this alternative. We are satisfied that notwithstanding Pacheco's failure to adequately apprise his references of the Committee's 1982 findings, the substantial written and oral testimony submitted on his behalf provides an acceptable estimate of Pacheco's moral character. Accordingly, the testimony presented merits considerable weight.

VI. *The Weight of the 1982 Findings.*

 As noted earlier, the Committee's notice to Pacheco describing the scope of the 1985 hearing stated that the focus would be on events subsequent to Pacheco's 1982 hearing. Prior to the hearing in 1985, the principal referee informed Pacheco that "direct evidence will not be taken from second parties" regarding the Committee's 1982 findings. When the panel

ultimately issued its findings in January 1986, the panel noted that it had considered the 1982 findings, but did not elaborate, and instead focused on the three incidents involving Pacheco which took place since 1982. Pacheco then appealed the panel's recommendation to the full Committee. In June 1986, the Committee provided Pacheco with a two-hour hearing.

Despite the Committee's professed concern in 1985 with Pacheco's post-1982 conduct, the Committee's 1986 findings and conclusion painted a much different, and far more damning picture than did the findings of the hearing panel. Eleven of the Committee's thirteen findings of fact were restatements of the 1982 findings. Included in this group of 11 findings was a 1969 incident of misconduct that had been excluded by stipulation from the August 1985 hearing. Each of these 11 findings dealt with Pacheco's conduct prior to 1977. Only two of the thirteen findings —the child custody and the property transfer matters —involved post-1982 conduct.

Similarly, the Committee's 1986 conclusions were based almost exclusively on matters that were the subject of the 1982 proceedings. For example, the Committee concluded that Pacheco "demonstrated a lack of respect for the judicial process in his involvement of counseling [a murder witness] to evade service of process." The Committee neglects to mention, however, that the incident occurred 12 years earlier, in 1974. In fact, nowhere in the Committee's findings and conclusion is the date of any of the alleged misconduct mentioned. That the Committee's 1986 findings and conclusion focused primarily on Pacheco's pre-1977 conduct is not surprising in light of what actually transpired at the Committee hearing. The balance of the hearing was comprised of a question and answer session pertaining to Pacheco's misconduct prior to 1977. Essentially, the Committee asked Pacheco to provide his version of every one of the twelve incidents that the Committee cited in its 1982 findings as a basis for its refusal to certify. Arguably, the Committee was fully justified in devoting so much attention to that decade-old misconduct on the basis that a thorough inquiry was required to properly evaluate Pacheco's claim of rehabilitation. Nevertheless, we are troubled by three considerations.

First, it is clear from the hearing transcript that both Pacheco and his attorney were caught woefully off-guard by the Committee's questioning. In the present case, the Committee hearing was for the purpose of reviewing the hearing panel's decision. The hearing panel's notice of hearing, the hearing itself, and the panel's findings consistently emphasized that the critical issue to be considered was Pacheco's post-1982 conduct. When the hearing panel recommended against certification and Pacheco appealed that decision, he was justified in believing that the Committee, too, would focus on his post-1982 conduct.

Second, by questioning Pacheco on the facts underlying the 1982 findings, the Committee was, in essence, going behind its own findings. By so doing, the Committee placed Pacheco in an unfair dilemma. If, on the one hand, Pacheco challenged the 1982 findings, he left himself open to lack of candor charges, as the Committee had investigated the basis for those findings to its satisfaction once before. On the other hand, if Pacheco accepted the 1982 findings, he left himself open to charges that he had lacked candor in 1982 by his refusal at that time to acknowledge culpability.

 We have held repeatedly that an applicant's refusal to accept the State Bar's version of the applicant's conduct must not be counted against the applicant. " '[R]efusal to retract his claims of innocence and make a showing of repentance appears to reinforce rather than undercut his showing of good character. . . . [¶] An individual's courageous adherence to his beliefs, in the face of a judicial or quasi-judicial decision attacking their soundness, may prove his fitness to practice law rather than the contrary. We therefore question the wisdom of denying an applicant admission to the bar if that denial rests on the applicant's choosing to assert his innocence regarding prior charges rather than to acquiesce in a pragmatic confession of guilt, and conclude that [he] should not be denied the opportunity to practice law because he is unwilling to perform an artificial act of contrition.' " (*Hightower* v. *State Bar, supra,* 34 Cal.3d 150, 157; *Martin B.* v. *Committee of Bar Examiners, supra,* 33 Cal.3d 717, 725-726; *Hall* v. *Committee of Bar Examiners, supra,* 25 Cal.3d 730, 744-745.) As Pacheco's counsel aptly stated in his closing argument to the Committee, lack of candor is "a valid standard [for certification denial], but that's something different than saying that because there is a dispute as to testimony, that therefore [Pacheco] is lying."

 Third, we are troubled by the Committee's failure to more thoroughly address Pacheco's claim of rehabilitation. Only a small portion of the Committee's question and answer session dealt with Pacheco's post-1982 conduct—the balance of the session was simply a rehash of Pacheco's misconduct prior to 1977. Given the aged nature of that misconduct, the Committee should have paid particular attention to the evidence supporting or refuting Pacheco's rehabilitation.

The foregoing matters raise significant doubts about the fairness of the Committee's proceedings. Certainly, the Committee appears to have allowed itself to be carried away by the distant tide of Pacheco's earlier misconduct. Yet because we believe that Pacheco has satisfied the good moral character requirement despite the difficulties which he encountered at the 1986 Committee hearing, we need not reach the question of whether the Committee afforded him a fair opportunity to do so. (See generally,

*Martin B.* v. *Committee of Bar Examiners, supra,* 33 Cal.3d 717.) Obviously, the Committee believed Pacheco's misconduct, although nearly all of it was at least a decade old, was of sufficient weight to warrant a denial of certification. We disagree.

■ In reviewing a denial of certification to practice law, this court may consider any acts or conduct occurring at any time, provided they have a legal tendency to prove the applicant's present conduct. (*In re Wells* (1917) 174 Cal. 467, 475 [163 P. 657].) We have, however, recognized that the passage of time lessens the significance of an applicant's misconduct, particularly when that misconduct occurred long before his or her application to the bar. (See, e.g., *Martin B.* v. *Committee of Bar Examiners* (1983) 33 Cal.3d 717, 726 [190 Cal.Rptr. 610, 661 P.2d 160] ["the passage of nine years with an unblemished, exemplary record, in itself should be sufficient to show rehabilitation" and bring about the admission of a man charged with two rapes while serving in the Marine Corps]; *Hall* v. *Committee of Bar Examiners, supra,* 25 Cal.3d 730, 742 ["we are also impressed by the fact that six years have elapsed since the last of the four incidents took place, during which time no complaints of any kind have been lodged" against petitioner]; *Hallinan* v. *Committee of Bar Examiners, supra,* 65 Cal.2d 447, 464 [applicant involved in nine fistfights, six of which were "inexcusable" and occurred at least six years prior to application for admission held not to bar admission].)

■ In the present case, Pacheco's misconduct occurred before 1977. The nature of that misconduct appears to be less serious than that alleged in *Martin B., Hall,* and *Hallinan.* Pacheco's period of rehabilitation is approximately as long as that of the petitioners in those cases. Thus, the value of Pacheco's misconduct in providing an indication of his present moral character is, in our view, quite limited.

Had Pacheco been disbarred, after five years he could have filed an application for reinstatement. (Rules Proc. of State Bar, rule 662.) ■ We would have reinstated him upon a showing of " 'sustained exemplary conduct over an extended period of time that he has reattained the standard of fitness to practice law.' " (*Martin B.* v. *Committee of Bar Examiners, supra,* 33 Cal.3d 717, 726; *In re Petty* (1981) 29 Cal.3d 356, 362 [173 Cal.Rptr. 461, 627 P.2d 191] [theft and forgery]; *In re Conflenti* (1981) 29 Cal.3d 120, 124-125 [172 Cal.Rptr. 203, 624 P.2d 253] [receiving stolen goods].) As noted earlier, Pacheco submitted a substantial number of letters written by attorneys and judges who attested to his good moral character as well as to his professional competence. ■ The evidence presented supports a showing that Pacheco has demonstrated the requisite conduct over an extended period of time to merit a finding of good moral character.

## VII. *Pacheco's Rehabilitation.*

 Although some of Pacheco's pre-1977 conduct may have involved moral turpitude, we have held that such conduct is not determinative if the petitioner demonstrates his rehabilitation and moral qualification to become a member of the bar. (*Hightower* v. *State Bar, supra,* 34 Cal.3d 150, 157; *March* v. *Committee of Bar Examiners, supra,* 67 Cal.2d 718, 731.)

" 'Rehabilitation . . . is a "state of mind" and the law looks with favor upon rewarding with the opportunity to serve, one who has achieved "reformation and regeneration." (*In re Gaffney* (1946) 28 Cal.2d 761, 764 [171 P.2d 873]; *In re Andreani* (1939) 14 Cal.2d 736, 749 [97 P.2d 456].)' " (*Hightower* v. *State Bar, supra,* 34 Cal.3d 150, 157; *March* v. *Committee of Bar Examiners, supra,* 67 Cal.2d 718, 732, *Resner* v. *State Bar* (1967) 67 Cal.2d 799, 811 [63 Cal.Rptr. 740, 433 P.2d 748].) In the present case, Pacheco appears to have met the rehabilitation requirements. His record as a licensed private investigator, his involvement in community projects, and the letters and testimony on his behalf provide a clearer, more accurate picture of his present moral character and rehabilitation than do his offenses from a decade ago upon which the State Bar so heavily relies. Pacheco's conduct since 1977 stands in marked contrast to his earlier misdeeds. He has established himself as an esteemed member of his community and of his profession. His perseverance during his seven-year quest to gain certification merits commendation.

The sole blemish on Pacheco's record since graduating from law school in 1978 appears to be his ill-advised involvement in the technically legal, but ethically suspect child custody incident. In our view, Pacheco's involvement in that incident is simply insufficient to demonstrate a lack of rehabilitation.

## VIII. *Conclusion*

To order Pacheco's certification is not, of course, to condone his earlier indiscretions or to imply that the Committee erred in its investigation of them. If either were the case we might have ordered Pacheco's certification following the Committee's refusal to do so in 1982. Presently before us, however, as set forth above, is a substantial amount of credible evidence establishing Pacheco's rehabilitation. Against that evidence, the State Bar presents a weak case: it resurrects its 1982 findings, adds some fresh, but generally insignificant allegations, then places the old and the new before us in an effort to prove that Pacheco presently lacks good moral character. The State Bar also seems to overlook the fact that Pacheco has already paid a high price for his earlier misconduct: seven years have elapsed since he passed the bar examination. Based on the evidence presented, we do not

believe that it would be fair to delay further Pacheco's admission. We believe that Pacheco has adequately shown that he has rehabilitated himself since the incidents which first caused his disqualification.

The Committee of Bar Examiners is ordered to certify petitioner Charles Anthony Pacheco to this court as one qualified to be admitted to practice law.